# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| DYNCORP INTERNATIONAL, LLC | § | |
| | § | |
| V. | § | CASE NO. 4:05CV436 |
| | § | (Judge Schneider/Judge Bush) |
| LYNN TATAR, ET AL. | § | |

## ORDER

Defendants have filed Motions for Summary Judgment (Dockets 24 and 25).  Having considered the motions, responses, and replies, the Court finds as follows.

## STANDARD

A party is entitled to summary judgment on all or any part of a claim "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).   The moving party must show initially that there is no genuine issue of any material fact.  *Id.* at 256.  The movant may meet this burden by pointing out the absence of evidence supporting any essential element of the non-moving party's claim.  *Celotex Corp. V. Catrett*, 477 U.S. 317 (1986).

In deciding whether to grant a motion for summary judgment, the Court "review[s] the evidence and inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991) (*citing Duvall v. The Ritz Carlton Hotel Co.*, 946 F.2d 418, 420 (5th Cir. 1991), *and quoting* Fed. R. Civ. P. 56(c)).

An issue is "genuine" only if the evidence could lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir. 1992) (*citing Anderson*, 477 U.S. at 255).

The opposing party may not rest on the mere allegations or denials of artful pleading, but must set forth affirmative facts that show a genuine issue for trial. *Anderson*, 477 U.S. at 256. This requires that the non-moving party make a showing sufficient to establish the existence of any element essential to that party's case, and on which that party will bear the burden at trial. *Nowlin v. R.T.C.*, 33 F.3d 498, 501 (5th Cir. 1994) (*citing Celotex*, 477 U.S. at 322-23).

## History

Each party seeks death benefits payable under a defined benefit plan administered by DynCorp International ("DynCorp"). The decedent, Michael Tatar ("Tatar"), was employed as a police consultant in Iraq and died in that country on November 12, 2004. (Stipulation 9). In July 2003, Tatar interviewed with DynCorp concerning employment as a police consultant in Iraq. It appears at that time he completed some forms for employment including a designation of beneficiary for life insurance designating Lynn Tatar ("Lynn"), his wife, as 100% beneficiary to the Plan 504 accidental death benefits policy. (Stipulation 5). Since he did not have enough years of police service, he was not qualified for the job at the time of his interview. He returned to his job as a prison guard in Bonham until he could accumulate enough time for service overseas. In June of 2004, Tatar and Lynn, his wife of almost thirty years, were divorced. (Stipulation 8). Shortly thereafter he deployed for Iraq.

After Tatar's death, DynCorp found a copy of his designation form in a file overseas. His original personnel file contained no beneficiary form. No original beneficiary form has ever

been located.  DynCorp's human resources contact in Dubai stated that when her office received Tatar's original files from the training site in Virginia, there were only a few original documents in his file, but no beneficiary designation form.  Human resources in Dubai contacted Tatar's deployment site in Iraq where a copy of the Lynn Tatar designation form was located.  This form was reportedly "couriered" by Tatar on his arrival in Iraq.  The only designation form in any file listed Lynn Tatar as the beneficiary.  (Stipulation 11).  The policy is part of DynCorp's welfare benefit plan and is a qualified ERISA plan.  (Stipulation 2).

According to the other claimant, Katherine Carey ("Carey"), Tatar's sister and independent administratix of his estate, she found a beneficiary form in Tatar's personal effects shipped from Iraq.  (Stipulation 14).  This "cut and paste" form is identical to the 2003 form except that Carey's name and relationship have been inserted in the place of Lynn.  (Stipulation 15).  No copy of the "cut and paste " form was in the files of DynCorp, or at least one could never be located.  (Stipulation 18).  A comparison of Tatar's designation of Carey as contact on his Foreign Service Contract and the "cut and paste" form designating Carey as his beneficiary demonstrates, at least to the Court's satisfaction, that both are in Tatar's writing.  The parties also stipulated that Tatar submitted the Lynn Tatar beneficiary form to his human resources representative in accordance with the terms of the 504 plan.  (Stipulation 6).  Carey has filed a Motion to Withdraw this stipulation.  (Docket 29).  The Court **GRANTS** the Motion.  It is evident that there is at least some doubt as to the manner in which the form was submitted to human resources in that human resources did not have an original beneficiary form.  However, there is no dispute that the only beneficiary designation in Tatar's file was that of Lynn and it is a copy , not an original.

Two points bear mention.  First, a beneficiary could only be changed when the form was

submitted by the insured (not Carey) to the Human Resources Director. Second, enrollment in the plan was conditioned on reaching the employee's final work station, in this case, Iraq. Although the original enrollment form could not be located, the findings of the benefits committee stipulated to by the parties indicates that the copy in the company's files would be a copy of what Mr. Tatar completed and that he himself personally couriered to the deployment site. (*See* Def. Carey's Mot. for Summ. J., Ex. A). Both the ex-wife, Lynn and the sister, Katherine, made claims to the policy for $160,000.

Carey first asserts that the divorce divested Lynn of any claim to life insurance benefits citing TEX. FAM. CODE ANN. § 9.302 (2006). However, the law is well settled that an ERISA plan provision preempts conflicting state law. *Egelhoff v. Egelhoff*, 532 U.S. 141 (2001). If the Court were to blindly enforce the provisions of the plan, then Lynn would appear to be the putative beneficiary and entitled to the proceeds.

Congress mandated that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by the statute. 29 U.S.C § 1144(a) (1998); *Brandon v. Travelers Ins. Co.*, 18 F.3d 1321, 1325 (5th Cir. 1994). A former spouse may waive his or her beneficiary status to those benefits and proceeds of an ERISA plan. *Guardian Life Ins. Co. of Am. v. Finch,* 395 F.3d 238 (5th Cir. 2004); Manning v. Hayes, 212 F.3d 866, 871 (5th Cir. 2000). The Fifth Circuit applies the federal common law of waiver to determine whether the named beneficiary waived his or her rights to an ERISA-governed plan. *Guardian Life*, 395 F.3d at 240. In fashioning its federal common law, the Fifth Circuit has adopted the Texas rule creating a presumption of waiver absent re-designation following divorce. TEX. FAM. CODE ANN. § 9.302. However, in looking to state family law for guidance, the Circuit recognized that wholesale adoption of the Texas re-designation statute would not sufficiently

protect the interests of beneficiaries. Thus, in its fashioning of federal common law, the Court modified the adoption of state law to require that any waiver be voluntary, in good faith, and explicit. *Manning*, 212 F.3d at 871.

Prior to engaging in an analysis on the waiver issue, the Court sets forth the findings of the benefit committee. Because of the change in ownership of the company, no resolution has ever been made as to the proper beneficiary. It appears rather than appointing a successor committee, the company merely filed this suit in interpleader "desiring to wash its hands of the entire matter." The summary of findings are jointly stipulated to by the parties:

> 1. Per attachment A to Mr. Tatar's Service Employment Agreement, Mr. Tatar was a participant in "Plan 504." Plan 504 is an ERISA welfare benefits plan that provides death benefits (in the amount of $160,000) among other benefits.
>
> 2. Plan 504 is a self-funded plan, in which the plan sponsor "funds" into the Plan the money that the Plan uses to pay out Plan benefits. It is not an "insured" plan.
>
> 3. In association with Plan 504, the company had itself purchased insurance, through Lloyds. The proceeds of that insurance are paid to the company. This operates like "key man life insurance." Benefits are payable under Plan 504 irrespective of whether the company maintained, or cancelled, such insurance coverage. By having such insurance, the company was able to have cash on hand for paying benefits under the plan, to avoid otherwise having to spend the company's normal cash resources.
>
> 4. Because of the existence of the Lloyd's policy, Plan 504 is sometimes referred to as the "Lloyd's insurance," but in fact the Lloyd's policy and Plan 504 are different things.
>
> 5. Through January 31, 2005, Plan 504 was sponsored by DynCorp, and covered employees of its various subsidiaries, such as Mr. Tatar. At February 1, 2005, DynCorp International LLC ("DI") became plan sponsor, per terms of the December 2004 sale agreement covering the sale of DI and various affiliates. This Committee was the fiduciary for Plan 504, having responsibility and authority for making benefit determinations.
>
> 6. The sale of DI was consummated on February 11, 2005, shortly before this 4:45 meeting. At the moment of the sale, the role of this Committee automatically "expired." DI needs to appoint a replacement committee to serve as fiduciary under Plan 504, who will make benefit determinations, including those for this matter.

7. Although this Committee therefore had no further authority in this matter at the time it met, it convened in order to create a clear record of its findings and activities in this matter, to assist the successor fiduciary in the handling of this matter.

8. In December 2004, correspondence from James E. Walker, Esp. was received. Mr. Walker represents Mr. Tatar's sister, Katherine Carey. The letter did not make a claim for benefits, but requested that a benefits distribution not occur, and cited Texas Family Code Sections 9.301 and 9.302. The letter requested copies of beneficiary designations and other information. In a later phone conversation with Kurt Hallock (CSC's ERISA attorney, who serves as counsel to this Committee), Mr. Walker indicated that he was representing Mr. Tatar's sister not individually, but in her capacity as Executrix of Mr. Tatar's estate. In that call he indicated that such appointment had not yet occurred, and still had not apparently occurred by the time of the Committee's February 11, 2005 meeting.

9. In December 2004, correspondence from Terry K. Fleming, Esq. was received. Mr. Fleming represents Mr. Tatar's former wife, Lynn M. Tatar. The letter sought information and asked to be advised of benefits to which she may be entitled. Mr. Fleming also sent letters in January 2005, similarly pointing out Sections 9.301 and 9.302 of the Texas law, and requesting benefit application forms.

10. The Committee determined that benefits under the plan would be payable to whoever Mr. Tatar designated as beneficiary.

11. The Committee determined that to the extent that the Texas law cited would conflict with the result under a beneficiary designation for the Plan, then that Texas law was legally pre-empted and of no effect. This is per ERISA Section 514(a) (29 USC 1144(a)), and per binding US Supreme Court legal precedent, such as the *Boggs v. Boggs* case.

12. The Committee recognized that as plan fiduciary, it would have a general obligation to initiate its own determination of who was entitled to the Plan benefits, even without a claim for benefits being received.

13. The Committee acknowledged that it had not replied to the request from attorney Walker, because that request was being made "in capacity of being attorney for the proposed Executrix." In similar past situations involving such an ending appointment, the Committee waited until the pending appointment actually occurred before responding, because until appointed, the person making the request did not yet have "standing" to obtain the information being sought.

14. The Committee had a meeting scheduling for February 2, 2005, at which it was going to make determinations in this matter. At that time, only the beneficiary form naming Lynn M. Tatar was before the Committee. However, hours before its scheduled meeting, the Committee learned that Ms. Carey was submitting information to Human Resources, and the Committee therefore "pended" this matter until that

information was received and could be taken into consideration. Once that information arrived, chain of custody-related inquiries (as described below) occurred, and those inquiries did not conclude until late in the day of February 11, 2005, at which time the Committee promptly met.

15. The post February 2 submission by Ms. Carey included a photocopy of a beneficiary form that identified herself as the beneficiary.

16. The Committee examined that form, and also the beneficiary form found in the company's own files, which named Lynn M. Tatar. After diligent search, the Committee was unable to locate any evidence that Ms. Carey's form existed in the company's files. The Committee further determined that the signature block and dating on the 2 beneficiary forms seemed to be identical, as if they were a photocopy of the same thing. The Committee noted that the top part of the Katherine Carey form (the "Full Name" line, designating the name of the beneficiary) had double underlining, unlike the Lynn Tatar form, as if that name had been cut and pasted in on the form and then a copy made. The Committee engaged only in visual observations, noting that if such steps occurred, the Committee was unable to determine when that change occurred, or who made such a change, or what such change signified.

17. The Committee concluded its review and determinations, by specifically noting that because it was no longer the fiduciary, it had not made any determination regarding the central matter, of who is entitled to the $160,000 benefit. That matter remains an open question for resolution by the successor fiduciary.

18. The Committee also made findings regarding "chain of custody" and related issues concerning the origin and handling of the beneficiary forms it reviewed, as described below in the words of Mr. Ardel Reyes from the Human Resources Dept., who recited these matters to the Committee.

(Docket 21, Joint Stipulation # 3; Docket 25, pg. 85-87).

Carey argues that the divorce decree demonstrates that Lynn effectively waived her rights to benefits under the plan. However, any such waiver must be "explicit, voluntary , and made in good faith." *See Brandon*, 18 F.3d at 1327. The Court has reviewed the divorce decree and finds no mention of the DynCorp policy. The only insurance which is mentioned is an Allstate policy insuring Tatar's life. The decree divests Lynn of any claim in that policy as well as any claims in two specifically named retirement accounts with the State of Texas. Although the DynCorp policy is not referenced, there does appear to be a clear intent on the parties to segregate Tatar's retirement

or pension funds from any claim by Lynn. Yet, as Lynn points out, there is no express intent to waive her right to any proceeds in the DynCorp policy and there is no other language which appears to express an intent to fully divest the parties of all rights they may have in any other existing pension plans or insurance policies.

Could the parties divide a right that at best was only a contingent right if Tatar was employed overseas? Tatar's employment agreement is specific. There is no coverage until he is overseas. Therefore, the designation , if effective at all, takes effect over one year after he filled out the form, and approximately one month after his divorce. The copy of the 2003 form designates Lynn with her relationship as "wife." Yet at the time it became effective, there is no dispute that she was no longer his wife. From Carey's perspective, the divorce, Tatar's will, and durable power of attorney make a compelling argument that she should receive the proceeds. Yet the Court's determination must rest with Lynn's conduct if the copy of the beneficiary form is valid.

Lynn contends that she could not waive her right in the DynCorp policy because there was, in effect, no right to waive. Tatar was not an employee until the August 2004, when he and DynCorp signed his employment agreement. The employment agreement does state that on signing the agreement, Tatar would have the right to designate a beneficiary. Lynn contends that the 2003 document became effective on his arrival in Iraq. Of interest are the statements of the Committee stipulated to by the parties that Tatar was required to complete various documents that were part of his new hire package on completion of his training in Virginia. This occurred after his divorce and long after he signed the first beneficiary designation. The agreement also states a binding contract can be formed only after both parties sign. Even Lynn admits she had no interest in the DynCorp plan on the date of her divorce. The agreement also provides that the Contract (including the benefit section) sets forth  the entire agreement between the parties hereto and fully supersedes any and all

prior agreements or understandings, written or oral, between the parties pertaining to the subject matter hereof.  The benefit section states that the employee will be asked to designate a beneficiary when he signs the Foreign Service or Employment Agreement.

In the end analysis, if Lynn's designation form is valid, there is no language in the decree of divorce that operates as a waiver of whatever interest she may have had.  All parties have cited authority in support of their respective positions.  However, the Court is not able to find a case where a form was filled out when the employee was not then employed or capable of receiving plan benefits and where there was no contract of employment or even the prospect of immediate employment.  As Lynn points out in her affidavit, DynCorp contacted her at her home in July 2004, to find out if Tatar was still interested in working with DynCorp.  Within a short period thereafter, Tatar participated in training and was deployed.

In light of the foregoing, the Court DENIES each party's motion for summary judgment and GRANTS Defendant Carey's Motion to Withdraw Stipulation 6.

**SIGNED this 21st day of September, 2006.**

_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE